UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
          (For Online Publication Only)
-------------------------------------------------------------------X
UNITED STATES OF AMERICA,

 

**MEMORANDUM & ORDER**
16-cr-00412-JMA-JMW-1

       -against-

JOHN DEROUNIAN,

**FILED**
**CLERK**

8:55 am, Aug 01, 2024

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

               Defendant.
-------------------------------------------------------------------X

**AZRACK, United States District Judge:**

Petitioner John Derounian recently finished serving a 121-month federal prison sentence in the above-referenced prosecution, which was imposed following his guilty plea to one count of mail fraud and to one count of possession of child pornography in violation of 18 U.S.C §§ 1341 and 2252(a)(4)(B). (ECF No. 114, Judgment in Crim. Case ("Judgment").) While he was still a federal prisoner, Derounian moved pro se under 28 U.S.C. § 2255 to vacate his conviction, alleging that his trial counsel and appellate counsel were constitutionally ineffective and that the government purposefully withheld exculpatory evidence, fabricated evidence, and made material misrepresentations to the Court.[1] (ECF No. 206 ("Derounian Pet.")) Derounian also moved for an evidentiary hearing (ECF No. 206), for a temporary restraining order (ECF No. 240), for disqualification of counsel (ECF No. 249), for appointment of counsel (ECF No. 252), and for emergency preliminary injunctive relief (ECF No. 253). For the below reasons, the Court

---

[1] Pro se filings are held to less rigorous standards than counseled filings are. See Estelle v. Gamble, 429 U.S. 97, 106 (1976). Thus, the Court must "construe pro se pleadings liberally and interpret them 'to raise the strongest arguments they suggest.'" Rahmankulov v. United States, 2023 WL 3303949, at *1 (S.D.N.Y. May 8, 2023) (quoting Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (emphasis in original) (internal quotation marks and citations omitted); accord Kirkland v. Cablevision Sys., 760 F.3d 223, 224 (2d Cir. 2014). Because Derounian proceeds pro se, the Court accords his petition and his related motions that liberal construction.

respectfully denies Derounian's petition without need for an evidentiary hearing and respectfully denies his ancillary motions in their entirety.

## I.   BACKGROUND[2]

### A.   Factual Background[3]

#### 1.   Criminal Conduct Overview

##### a)   *The Jane Doe Fraud*

In early 2016, Morgan Stanley Smith Barney LLC ("MSSB") contacted the government concerning suspicions about possible fraud involving the estate of a deceased female client ("Jane Doe").  (PSR ¶¶ 6–9.)

On November 12, 2015, John Derounian had reported Doe deceased to government authorities after—as Derounian claimed—he had discovered her half-naked body inside her apartment at 16 The Boulevard in Sea Cliff, New York.[4]  (PSR ¶ 7.)  Derounian later made false

---

[2]     Unless otherwise indicated, citations to docketed items refer to those materials that appear on ECF in Derounian's criminal case, United States v. Derounian, Case No. 16-cr-00412-JMA-JMW-1 ("Derounian Crim."). However, the Court also cites to Derounian's direct appeal of his sentence to the Second Circuit, United States v. Derounian, No. 19-1818-cr, 2022 WL 211998 (2d Cir. Jan. 25, 2022) ("Derounian Appeal"), Derounian's appellant brief (Derounian Appeal, ECF No. 118 ("Derounian Appeal Br.")), the government's appellee brief (Derounian Appeal, ECF No. 143 ("Gov't Appeal Opp.")), Derounian's reply brief (Derounian Appeal, ECF No. 150 ("Derounian Appeal Rep. Br.")), Derounian's appellate appendix (Derounian Appeal, ECF No. 119 ("A")), and the government's appellate appendix (Derounian Appeal, ECF No. 143 ("GA")).  Additionally, the Court considers Derounian's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255 (ECF No. 206 ("Derounian Pet.")), the government's memorandum of law in opposition to Derounian's petition (ECF No. 209 ("Gov't Derounian Opp.")), Derounian's reply memorandum of law in support of his petition (ECF No. 220 ("Derounian Rep.")), Derounian's reply memorandum supplement (ECF No. 222 ("Derounian Rep. Supl.")), Derounian's second reply memorandum supplement (ECF No. 224 ("Derounian Second Rep. Supl.")), Derounian's supplement to his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255 (ECF No. 239 ("Derounian Pet. Supl.")), the government's Court-Ordered response in opposition to Derounian's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255 (ECF No. 255 ("Gov't Derounian Supl. Opp.")), Derounian's reply to the government's Court-Ordered response ("Derounian Rep. Supl. Opp.")), as well as the declarations and exhibits attached to all the above-mentioned filings.

[3]     The facts are drawn from the sealed presentence report (Derounian Crim., ECF No. 98 ("PSR")), the sealed supplemental presentence report (Derounian Crim., ECF No. 243 ("Supl. PSR")), the government's appellee brief (Derounian Appeal, ECF No. 143 ("Gov't Appeal Opp.")), Derounian's appellate appendix (Derounian Appeal, ECF No. 119 ("A")), and the government's appellate appendix (Derounian Appeal, ECF No. 143 ("GA")).  All factual inferences are drawn in favor of the government.  See Reddy v. Coombe, 846 F.2d 866, 869 (2d Cir. 1988) (A court "must credit every inference that could have been drawn in the state's favor ... whether the evidence being reviewed is direct or circumstantial.").

[4]     Derounian claimed that Doe was naked from the waist down with a bag over her genitals.  (A 123 n.1, 200.)

statements to the Nassau County Medical Examiner and the Nassau County Police Department ("NCPD") claiming that he was Doe's landlord, that she had no relatives, and that he was the executor of Doe's estate.  (Id.)  Doe's body eventually was released to Derounian, with his instructions that it be cremated immediately.  (Id.)

At the time of Doe's death at age 79, she owned approximately $1.5 million in assets, including a MSSB individual account containing $139,558 ("6372 Account"); a MSSB individual retirement account containing $102,205 ("6482 Account"); and real property in Glen Cove, New York, with an approximate value of $1 million.  (PSR ¶¶ 8, 20.)

Over eight months, several attempts were made by Derounian to liquidate the various accounts.  (Gov't Appeal Opp. at 4.)  In November 2015, a MSSB financial advisor ("advisor #1") was contacted via telephone by an unknown individual identifying himself/herself as Jane Doe.  (PSR ¶ 9.)  That person sought to add Derounian as an authorized user of Doe's accounts and requested a change of address from Doe's address on file (19 Eastland Drive, Glen Cove, New York) to 16 The Boulevard.[5]  (Id.)  A review of commercial databases—coupled with NCPD reports and New York State Parole records—revealed that Derounian's mother was the owner of 16 The Boulevard and that Derounian lived in one of the apartments there (as did Derounian's mother).  (PSR ¶ 10.)

Between November 15, 2015 and November 19, 2015, 19 ATM withdrawals, totaling $9,697, were made from the 6372 Account.  (PSR ¶ 11.)  Video surveillance of seven of these withdrawals indicated that Derounian was making the withdrawals.  (Id.)

Also on November 19, 2015, advisor #1 received an email from an email account on file with MSSB for Jane Doe, containing scanned copies of Doe's New York State driver's license, an

---

[5]     Advisor #1 advised the caller that MSSB could not change the address on the accounts without proper documentation of Jane Doe's new address.  (PSR ¶ 9.)

Empire State health plan bill, and a National Grid utility bill, all purportedly sent by Doe after her death.  (PSR ¶ 12.)  The email requested a change of address from 19 Eastland Drive to 16 The Boulevard.  (Id.)

In late December 2015 through early January 2016, a MSSB employee ("advisor #2") received a series of emails from the Jane Doe email account, instructing advisor #2 to liquidate and distribute all funds associated with both MSSB accounts.  (PSR ¶ 13.)

On January 6, 2016, a document purporting to be Jane Doe's last will and testament was filed in the Nassau County Surrogate's Court.  (PSR ¶ 14.)  The will was backdated to July 3, 2015 and was purportedly signed by Jane Doe.  (Id.)  But the will was signed by Derounian's wife at Derounian's direction, and it bequeathed the entirety of Doe's estate to Derounian—minus $30,000 in charitable distributions.  (Id.)

On January 11, 2016, advisor #1 received a telephone call from an individual purporting to be Jane Doe requesting the disbursement of all monies in Doe's accounts.  (PSR ¶ 15.)  On January 20, 2016, a check representing all monies from the 6372 Account was mailed out and later deposited into a TD Bank account—the signatories of which were Derounian and "The Estate of Jane Doe."  (PSR ¶¶ 15–16.)

On June 1, 2016, law enforcement investigators learned that Jane Doe's residence at 19 Eastland Drive had been sold by Derounian in April 2016 for approximately $1,050,000.  (PSR ¶ 17.)  The proceeds from the sale were deposited into a Citibank account, the signatories for which were Derounian and "The Estate of Jane Doe."  (Id.)  In June 2016, Derounian withdrew monies from the TD Bank and Citibank accounts.  (PSR ¶¶ 18–19.)  Derounian also attempted to liquidate a bank account Jane Doe held at Apple Bank.  That account contained approximately $274,052.  (PSR ¶ 20.)

b)    *The Child Pornography Offense*

Derounian was arrested at his residence on June 28, 2016 on fraud charges relating to the estate of Jane Doe.  (PSR ¶ 23.)  At that time, law enforcement agents executed a search warrant at Derounian's residence.  (Id.)  As a result of that search, law enforcement agents discovered a cache of over 500 images of child pornography—some of which contained images of prepubescent minors, toddlers, and infants being sexually assaulted.  (PSR ¶¶ 23, 45, 47.)

In a videotaped recording, Derounian told law enforcement agents after his arrest that he knew Jane Doe for many years and would check up on her periodically.  (PSR ¶ 24.)  He claimed that he had discovered her dead body on November 12, 2015 and called 911.  (Gov't Appeal Opp. at 7.)  He also claimed that he and Doe had a sexual relationship, that she had given him authorization to access her financial accounts and a debit card, and that she was his "sugar mommy."  (PSR ¶ 24.)  Derounian denied the presence of child pornography on his computers. (Id.)

**2.    The Indictment, the Plea Agreement, and Derounian's Guilty Plea**

a)    *The Indictment*

On July 26, 2016, a grand jury sitting in the Eastern District of New York indicted Derounian on mail and wire fraud charges.[6]  (ECF No. 10 ("Indictment").)

b)    *The Plea Agreement*

Before Derounian's guilty plea, Derounian's then counsel—Brian John Griffin—received discovery related to Derounian's case, and the parties engaged in negotiations related to a global

---

[6]    The indictment also included a criminal forfeiture charge.  (ECF No. 10, at 5–7.)

disposition of the pending charges.[7]  (A 73–74; <u>see</u> <u>also</u> A 97–98.)  As for the discovery, the prosecutor represented that defense counsel had:

> "[R]eceived the images which have been forwarded … as well as the search materials with respect to the browser.  I put him [defense counsel] in touch with the inspector assigned to the case so they could discuss the specific report recovered from the computer we believe to be Mr. Derounian's….
>
> I forward a copy of this document to [counsel]. He's in touch with the inspector. To that end I'll draft, based on requests I've had, a global disposition for both the images recovered and … the financial crime…."

(A 73–74.)

On June 25, 2018, Derounian pleaded guilty, under a plea agreement, before then-United States Magistrate Judge Gary R. Brown to Counts One and Three of a three-count superseding indictment ("Superseding Indictment").  (ECF No. 84; A 42–50, 131–59; PSR ¶ 1.)  Count One charged Derounian with mail fraud under 18 U.S.C. § 1341.  (A 44.)  Count Three charged Derounian with possession of child pornography under 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2).  (A 45–46.)

The plea agreement contained an estimated Sentencing Guidelines range calculation, following the Second Circuit's suggestion in <u>United States v. Pimentel</u>, 932 F.2d 1029, 1034 (2d Cir. 1991) ("Pimentel") (holding the government should "inform defendants, prior to accepting plea agreements, as to the likely range of sentences that their pleas will authorize under the Guidelines").  In relevant part, the plea agreement estimated a Guidelines range of 51–63 months' imprisonment were Derounian to receive a three-level acceptance of responsibility reduction in the calculations.  (A 31 at ¶ 2.)

More specifically, the plea agreement contemplated a base level offense of 18, under U.S.S.G. § 2G2.2(a)(1), on the child pornography charges.  (A 30 at ¶ 2.)  This base offense level

---

[7]     Steven Alan Metcalf II came to represent Derounian in December 2017.  (ECF No. 64.)

was increased by two levels under U.S.S.G. § 2G2.2(b)(2) (material involving prepubescent minors), two levels under U.S.S.G. § 2G2.2(b)(6) (use of a computer), and two levels under U.S.S.G. § 2G2.2(b)(7) (at least 10, but fewer than 150 images of child pornography), for a total offense level of 24 related to the child pornography charge.  (Id.)  The plea agreement also calculated a base offense of seven under U.S.S.G. § 2B1.1(a)(1) for the mail fraud charge, which level was increased by 14 levels under U.S.S.G. § 2B1.1(b)(1)(H), to reflect an actual loss amount of between $550,000 and $1.5 million.  (A 31 at ¶ 2.)  The resulting total offense was 21.  (Id.)  A grouping analysis resulted in a combined offense level of 26, from which three levels would be deducted for timely acceptance of responsibility under U.S.S.G. § 3E1.1, resulting in a total adjusted offense level of 23.  (Id.)  Given Derounian's estimated Criminal History Category II, the plea agreement anticipated an advisory Guidelines range of 51–63 months.  (Id.)

The plea agreement also contained the following limiting language, in relevant part:

> "The Guidelines estimate set forth [above] is not binding on the Office, the Probation Department or the Court. If the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement."

(Id. at 31–32) (emphasis added).)

Finally, the plea agreement contained no provision prohibiting the government from requesting an above-Guidelines sentence.  (Gov't Appeal Opp. at 11.)  Nor did it restrict the government's ability to recommend a specific sentence within the Guidelines.  (Id.)

c)    *The Guilty Plea Hearing*

Derounian acknowledged during the plea hearing that he understood the rights that he would be giving up by entering into the plea agreement and by pleading guilty.  (A 138–42.) Derounian was advised by Magistrate Judge Brown that the estimated Guidelines computation

contained in the plea agreement was not a guarantee of a specific sentence.  Indeed, Derounian's counsel pointed out that there were lingering questions about some of the details of the plea agreement (A 137–38), that it was highly likely that Derounian's criminal history category was higher than the Category II pointed to in the plea agreement, and that he had discussed that possibility with Derounian:

| | |
|---|---|
| Court: | . . . Has your attorney discussed the sentencing guidelines and the other sentencing factors that go into formulating a sentence? Have you discussed that? |
| Defendant: | He has. |
| Court: | So then you should understand, sir, that the sentencing guidelines which are estimated here are not mandatory, but that in sentencing the Court is required to consider the applicable guideline range along with the statutory factors listed in [18 U.S.C. § 3553(a)].  And what that means is the Court will consider the nature and circumstances of the offense and your criminal history and your personal characteristics in developing a sentence.  You understand that, yes? |
| Defendant: | I do. |
| [Counsel]: | Your Honor, may I just address one issue in those regards? |
| Court: | Sure. |
| [Counsel]: | As part of the agreement, the guidelines that have been calculated have been calculated as a category two.  Both [myself and the AUSA] believe that that is not the circumstances as to where he would fall.  And we have discussed in detail of him being of a higher category and these guidelines being on a little bit more of a higher end when we actually get past and are actually preparing for sentencing. |
| Court: | Okay.  Do you understand, sir? |

Defendant:                    I do.

Court:                         Here's the thing.  At the end of the day, the guidelines, they're all estimates.

Defendant:                    Right.

Court:                         (A), they could be wrong. (B), the judge doesn't necessarily—she has to consider them but she doesn't have to follow them at the end of the day anyway.  So the guideline estimates, they're not a guarantee.  Do you understand that?

Defendant:                    I understand.

Court:                         The only guarantee you have here is twofold.  Number one, you have the right to appeal if it's more than 71 months.  You understand that?

Defendant:                    I do.

Court:                         The second only guarantee as to how high your sentence could be is that statutory cap which is the 40 years I mentioned.  That's really your only guarantee.  Do you understand?

Defendant:                    I do.

Court:                         Do you recognize, sir, that if the penalty or the sentence imposed is more severe than you expect, you will not be able to withdraw your guilty plea.  Do you understand that?

Defendant:                    I do.

Court:                         You should know also that in formulating a sentence the District Court will consider other factors including the seriousness of the offense, just punishment, protection of the public from additional criminal conduct by you or by others.  Do you understand?

Defendant:                    I do.

| | |
|---|---|
| Court: | Do you have any questions you'd like to ask me about the charge, your rights, the sentence, anything? |
| Defendant: | No, Your Honor. |

(A 149–50) (emphasis added).)

Magistrate Judge Brown also determined that Derounian was not under some misunderstanding that he had received a promise of a specific sentence:

| | |
|---|---|
| Court: | Has anyone made you a promise as to what your sentence is going to be? |
| Defendant: | Not at all. |
| Court: | Understand it's your lawyer's job to give you an estimate. He can say based on my experience I think this, I think that. But that's not a promise and I think you know the difference. |
| Defendant: | I understand. |
| Court: | Right?  Yes? |
| Defendant: | I understand that. |

(A 152.)[8]

### 3.    The Sentencing

a)    *The PSR*

In anticipation of Derounian's sentencing, Probation issued a presentence investigation report that included an advisory Guidelines range of 97–121 months' incarceration.  (PSR ¶ 123.) The range was based on the following calculations: (1) a total offense level of 23 for mail fraud,

---

[8]      On October 4, 2018, this Court adopted the recommendation of Magistrate Judge Brown that Derounian's guilty plea be accepted.  (ECF No. 93.)

which included a base offense level of seven and a 16-point enhancement for intended (not actual) loss (PSR ¶¶ 37–38, 42); and (2) a total offense level of 30 for possession of child pornography (PSR ¶ 51), which included a base level offense of 18, plus several aggravating enhancements (materials involving a minor who had not yet attained the age of 12; images involving toddlers being vaginally and anally penetrated by an erect penis; use of a computer; and possession of more than 300, but fewer than 600 images) (PSR ¶¶ 43–47).  After a grouping analysis and a three-point reduction for timely acceptance of responsibility, Derounian's total adjusted offense level was 28. (PSR ¶¶ 52–59.)

The PSR also calculated Derounian's Criminal History Category to be III rather than II as was indicated in the plea agreement.  (PSR ¶ 64.)  This change reflected considerations related to Derounian's participation in the 1983 murder of the proprietor of Bellissimo Jewelers, a retail store located in Sea Cliff, New York.  (PSR ¶ 62.)  During the robbery of the store, Derounian repeatedly stabbed the owner.  Later, the victim was doused with cleaning solvent and the store was set on fire.  (Id.)  For this crime, Derounian received a sentence of 20 years to life, and he was on lifetime parole at the time he committed the crimes at issue, resulting in a two-point enhancement of his criminal history.  (PSR ¶¶ 62, 64–66.)

b)   *The Parties' Sentencing Submissions*

Around March 7, 2019, Derounian's counsel filed objections to the PSR.  (ECF No. 104; GA 1–6.)  While not contesting the Guidelines calculations per se, counsel contested certain factual statements contained in the PSR: (1) the claim that someone had been added as an authorized user of Jane Doe's MSSB accounts on the day before Derounian reported her death to authorities; (2) the extent of Derounian's medical ailments; (3) the contention that Derounian was a danger to his young daughter; (4) the statement that Derounian was a "malinger[er]"; and (5) the refusal of

Probation to accede to Derounian's contention that the mail fraud derived from duress or coercion. (GA 3–5.)  Derounian also sought a Fatico hearing in connection with his sentencing.  (GA 6.)

On April 2, 2019, Derounian's counsel filed a sentencing memorandum with this Court in which he argued, in relevant part, that (1) the PSR contained factual allegations about the crimes with which Derounian disagreed (i.e., Derounian's possible involvement in changes to Doe's MSSB accounts on the day before her death was brought to light, the failure of Probation to take into account the possibility that the mail fraud was the product of duress or coercion); (2) the number and kinds of child pornographic images, which exceeded the numbers that formed the basis of the Guidelines estimate in the plea agreement, were the result of counting multiple copies of single images and, in any event, often involved no pornography at all; (3) he was not a malingerer and his medical history and health issues, including mental health ailments, had been significantly minimized; (4) he was not only not a threat to his young daughter but was the principal person responsible for her and her mother's economic welfare.  (ECF No. 106; GA 7–63.)  As a result, Derounian's counsel argued that a sentence of time-served and probation would be more than sufficient under the parsimony clause in 18 U.S.C. § 3553(a).  (GA 9, 63.)  At no time did Derounian suggest that the government had breached the terms of the plea agreement or that he wished to withdraw his guilty plea.

On April 24, 2019, the government filed a sentencing letter of its own.  (GA 64–77.)  The letter agreed with Probation's Guidelines calculations (GA 65), addressed Derounian's objections to the PSR (GA 66–67), and argued that the 18 U.S.C. § 3553(a) factors—including (1) Derounian's prior murder conviction; (2) his cremation of his Jewish victim's body, which prevented law enforcement from later conducting an autopsy; and (3) the obvious need for deterrence of the defendant in light of his criminal history—warranted a sentence at the high end

of the advisory Guidelines range (GA 67–77).  The government also disagreed with Derounian's

characterization of any cooperation he may have provided to the government.  (GA 77.)

On May 21, 2019, the government filed a supplemental sentencing letter, telling the Court

that Derounian had provided information which resulted in the recovery of contraband from a

fellow inmate.  (GA 78–79.)  The government agreed that the Court could consider this information

at the time of sentencing.  (Id.)

c)     *Sentencing Proceedings*

Derounian's sentencing was held on June 6, 2019.  (ECF No. 113; A 160–210.)

To begin with, Derounian's counsel objected to the enhanced Guidelines for Derounian's

possession of child pornography, arguing that the government was or should have been aware of

the types and numbers of images in the case at the time of the plea proceeding and citing to United

States v. Wilson, 920 F.3d 155, 162 (2d Cir. 2019) (holding that the government had breached the

terms of its plea agreement by advocating for a higher sentence than the one included in the plea

agreement estimate).  (A 165–66, 169–170.)  Despite his reference to Wilson, however, at no time

did his counsel contend that the government had breached its plea agreement with Derounian or

suggest that Derounian sought to withdraw his guilty plea based on the disparity between the

estimated Guidelines range contained in the plea agreement and the advisory Guidelines range

identified in the PSR.

During the sentencing, the government reiterated its support for Probation's calculations in

the PSR.  (A 171.)  It also agreed that the estimate in the plea agreement had failed to correctly

represent the number and types of images of child pornography recovered from Derounian's

possession at the time of his arrest because of a misunderstanding between the prosecutor and case

agent.  (A 166–68.)  Specifically, at the time the prosecutor was negotiating the terms of the plea

agreement, he was under the misimpression that the number of pornographic images originally

identified by the case agent was equal to the total number of images of child pornography discovered on Derounian's computers and not, as it turned out to be, the number of images containing children identified by the National Center for Missing and Exploited Children, which number was significantly smaller.  (A 166–67.)  The prosecutor also stated that, at the time of the plea, he was unaware that certain child pornographic images (many of them thumbnail images, under one square inch) contained sadomasochistic depictions of minor children, requiring an additional Guidelines enhancement.  (A 167–68.)

Derounian's counsel also objected to the PSR's employment of intended (rather than actual) loss amount with respect to the mail fraud and argued that the government's calculations of the fraud loss amount never exceeded $1.5 million.[9]  (A 170.)

Following further argument by the parties, the Court noted that the estimated Guidelines in the plea agreement were not binding on the Court and adopted the Guidelines calculations in the PSR, including the advisory Guidelines range of 97–121 months.  (A 171–73.)  After hearing directly from counsel (A 174–80), Derounian (A 180–98), and the government (A 198–201), this Court detailed its sentencing considerations, including a recitation of the factors set forth in 18 U.S.C. § 3553(a) (A 202–03).  The Court highlighted, among other considerations, the following factors as relevant to its sentence: (1) Derounian's role as the "mastermind of a scheme to pilfer his deceased landlord of her assets," including his creation of a "forged will" and numerous other false documents; (2) Derounian's request that the medical examiner not conduct an autopsy on Jane Doe and his orchestrated cremation of Doe's body; (3) the number of images (more than 500) of child pornography in Derounian's possession, some of which images depicted infants and toddlers being sexually abused; (4) Derounian's prior murder conviction and long (more than 20

---

[9]      The government noted in its sentencing submission that the specific methodology of computing loss amount had no impact on the Guidelines calculations given the impact of the grouping analysis.  (GA 65.)

years) sentence for that crime; and (5) Derounian's medical history, including the fact that he claimed that he had been sexually abused.  (A 202–04.)  This Court then sentenced Derounian to a total term of 121 months' incarceration.  (A 204–05.)

### 4.    Direct Appeal to the Second Circuit

Derounian appealed this Court's amended judgment sentencing him to 121 months' imprisonment, five years of supervised release, and a fine and restitution after he pleaded guilty to one count of mail fraud and one count of possession of child pornography, in violation of 18 U.S.C. §§ 1341 and 2252(a)(4)(B).  Derounian's sole claim was that the government breached its obligations under the plea agreement by requesting a sentence nearly double the estimated Guidelines sentencing range set forth in the plea agreement.  See United States v. Derounian, No. 19-1818-cr, 2022 WL 211998, at *1 (2d Cir. Jan. 25, 2022).

On January 25, 2022, the Second Circuit affirmed this Court's amended judgment.  The Second Circuit found no error "because the plea agreement contained explicitly limiting language and the district court made sure that Derounian understood that the Guidelines range could change such that Derounian could not have a reasonable expectation that the estimated Sentencing Guidelines in his plea agreement would not be raised."  Id. at *2.

## B.   Procedural History

On January 3, 2023, Derounian petitioned this Court for the issuance of a writ of habeas corpus under 28 U.S.C. § 2255.  (ECF No. 206 ("Derounian Pet.").)  Derounian's request for relief falls into two general categories: (1) first—that the government purposefully withheld exculpatory evidence, fabricated evidence, and made material misrepresentations to the Court; and (2) second—that his trial and appellate counsel were constitutionally ineffective for various reasons. (Id.)

15

On February 10, 2023, the government timely opposed Derounian's petition.[10]   (ECF No. 209 ("Gov't Derounian Opp.").)  As for Derounian's first ground for relief, the government argued the Court already held that his assertions about inappropriate prosecutorial conduct were "utterly baseless" when it denied his motion for bond pending direct appeal.  (Id. at 2 (citing ECF No. 178).)  As for Derounian's second ground for relief, the government argued that Derounian cannot not carry his burden of demonstrating that his counsel's claimed deficiencies were constitutionally ineffective assistance.  (Id.)

On April 17, 2023, Derounian filed an untimely reply to the government's opposition. (ECF No. 220 ("Derounian Rep.").)  Then, on April 24, April 27, and July 5, 2023—without leave from the Court—Derounian filed three supplements to his untimely reply.[11]   (ECF No. 222 ("Derounian Rep. Supl."); ECF No. 224 ("Derounian Second Rep. Supl."); ECF No. 234 ("Derounian Third Rep. Supl.").)

On November 30, 2023—again without leave from the Court—Derounian supplemented his original petition ("Petition Supplement").  (ECF No. 239 ("Derounian Pet. Supl.").)  Therein,

---

[10]     On February 23, 2023, Derounian moved for an extension of time to reply to the government's opposition and moved for bond pending resolution of his petition.  (ECF No. 210.)  The same day, Derounian also moved for the appointment of counsel.  (ECF No. 211.)  On March 1, 2023, the Court filed an electronic order (1) granting Derounian's motion for an extension of time to file his reply until March 28, 2023; and (2) denying Derounian's motions for bond pending resolution of his petition and for appointment of counsel.  (Elec. Order dated Mar. 1, 2023.) The Court also denied Derounian's request for an evidentiary hearing without prejudice "once the briefing has been completed."  (Id.)

[11]     In the interim, Derounian filed various submissions with the Court—including a fifth motion for compassionate release and a motion for reconsideration of the Court's decision to deny bail pending resolution of his habeas petition.  (ECF Nos. 225, 227, 228, 230, 232.)  On July 20, 2023, the Court denied Derounian's fifth motion for compassionate release for essentially the same reasons articulated in more detail in the Court's prior orders denying compassionate release, (see ECF Nos. 154, 160, 178, 203).  (ECF No. 236.)  The Court also denied Derounian's renewed requests for bail pending resolution of his habeas petition.  (Id.)

Derounian attached material that he contends supports his claim of "egregious prosecutorial misconduct."[12]  (Id.)

About four weeks later, on January 4, 2024, Derounian moved for a temporary restraining order under Federal Rule of Civil Procedure 65 to avoid having to register as a sex offender upon his release from prison.  (ECF No. 240 ("TRO Mot.").)  To support his request for relief, Derounian argued that he was "falsely convicted of possessing child pornography."  (Id. at 8.)  Derounian's theory is as follows: (1) Forensic Computer Analyst Zachary Greenwood generated a forensic report of the two external USB thumb drives recovered from his residence on September 12, 2016, which was "never disclosed" to his trial counsel; (2) Analyst Greenwood's forensic examination establishes that the USB drives "contained no child pornography;" (3) Analyst Greenwood's forensic conclusion has been "affirmed in several responses to" Derounian's many FOIA requests; (4) and thus the USB thumb drives must have been "deliberately altered" by the government after the time they were examined by Analyst Greenwood.  (Id. at 5–6.)

On May 10, 2024, Derounian moved to disqualify Assistant United States Attorney Mark Misorek from this case, recycling many of the same allegations of prosecutorial misconduct found

---

[12]     First, Derounian takes issue with the government's assertion that he was responsible for the death of Jane Doe in this case. (Derounian Supl. Pet. at 1.)  Derounian attaches FOIA Analyst Lisa Frazier's response to a September 13, 2023, FOIA request, which he contends provides proof that he was "never under investigation for homicide." (Id.) But Frazier's response to Derounian's FOIA request says no such thing. (ECF No. 249, Ex. A.) Her response indicates that she found no responsive records for "[a]ny and all records generated by the U.S. Postal Inspection Service with respect to any criminal investigation in which [the requester] was suspected of being responsible for the death of [Jane Doe], including any records shared by the U.S. Attorneys' Office for the Eastern District of New York." (Id.) Frazier's response did not, however, state that Derounian was "never under investigation for homicide." (Derounian Supl. Pet. at 1.)  United States Postal Service General Counsel Christopher Doyle confirmed this when he affirmed in full Frazier's actions on appeal. (ECF No. 249, Ex. B.) Doyle's Opinion and Order—which denied Derounian's appeal and affirmed Frazier's search—confirmed only that "no responsive records were located," (id.), not that Derounian was "never under investigation for homicide," id.

    Second, Derounian contends that responses to his other FOIA requests confirm that "there was no child pornography on [the] two specific USB thumb drives" recovered from his residence. (Id.)  As explained below, Derounian mischaracterizes the many responses to his FOIA requests.  None of them establish—let alone posit—that the USB thumb drives contained no child pornography.  In any event, as explained below, it is clear from the record that Derounian's claims of government fabrication evidence are wholly without merit.  (See ECF No. 255.)

in his petition (ECF No. 206), his reply in support of his petition (ECF No. 220), and his various supplements.  (ECF Nos. 222, 224; see also ECF No. 249 ("Mot. to Disqualify Counsel").)  On June 28, 2024, Derounian renewed his request for appointment of counsel.  (ECF No. 252.)

About ten days later on July 8, 2024—again to avoid registering as a sex offender upon his release from prison—Derounian moved for "preliminary injunctive relief."  (ECF No. 253.)  To support his request for relief, Derounian recycled the same "innocence" arguments that he put forward in his Petition Supplement (ECF No. 239) and his motion for a TRO (ECF No. 240).  (Id.)

On July 11, 2024, the Court entered the following electronic order in response to Derounian's many motions: "At various points in connection with his 28 U.S.C. § 2255 petition, Pro Se Defendant alleges that the Government purposefully withheld exculpatory evidence, fabricated evidence, and made material misrepresentations to the Court.  (See, e.g., ECF Nos. 206, 220, 249, 252).  The Government is directed, no later than July 17, 2024, to file a detailed response to Pro Se Defendant's allegations on ECF.  The Pro Se Defendant may file a reply, if any, no later than July 24, 2024."  (Elec. Order dated Jul. 11, 2024.)

The government filed a timely response to the Court's July 11, 2024 Order, proffering facts relating to the recovery, forensic analysis, and additional review of the child pornography recovered from Derounian's home.[13]  (ECF No. 255 ("Gov't Derounian Supl. Opp.").)  Against

---

[13]    As explained in detail below, the government provided a documented record of (1) how the child pornography images recovered from USB drive BB0903NQVB ("USB Drive") were discovered during the execution of a search warrant at the time of Derounian's arrest ("Search Warrant #1"); and (2) how the USB Drive and other devices were inventoried by law enforcement.  (Gov't Derounian Supl. Opp. at 1–6.)  Further, the government detailed and appended a second search warrant (and its associated affidavit) that describes the probable cause leading to the recovery of the more than 500 images of child pornography on the USB Drive.  (Id. at Exs. B–C.)  The government also provided a copy of the of the USB Drive's forensic examination ("Forensic Report") conducted by the USPIS Forensic Examination Laboratory.  (Id. at Ex. D.)  Based on the results of the Forensic Report, the government described how Postal Inspector Hope Cerda reviewed the USB Drive and found approximately 514 images of child pornography.  (Id. at 4.)  The government also described that—in addition to Inspector Cerda and other members of law enforcement—the following people reviewed the images on the USB Drive: (1) AUSA Misorek; (2) Probation Officer Victoria Main; (3) Derounian's trial counsel; and (4) the undersigned.  (Id. at 7.)

that backdrop, the government argues it is clear from the record that Derounian's claims of government fabrication evidence are baseless.  (<u>Id.</u>)

Before filing his reply, Derounian called this Court's chambers several times requesting relief in contravention of the undersigned's Individual Rules.  (<u>See</u> Indiv. Rule III.A.)  So, on July 17, 2024, the Court entered the following electronic order: "The defendant has called Chambers numerous times, sometimes multiple times per day, and has left lengthy messages requesting relief. Phone calls to Chambers are not permitted.  All communications with the Court must be in writing. The Clerk of the Court is directed to mail a copy of this Order to the defendant at his last known address."  (Elec. Order dated Jul. 17, 2024) (emphasis omitted).)

On July 30, 2024, Derounian filed an untimely reply to the Court's July 1, 2024 Order.[14] (ECF No. 258.)  Derounian's reply—in sum and substance—recycled the same allegations of prosecutorial misconduct found in his petition (ECF No. 206), his reply in support of his petition (ECF No. 220), his various supplements, (ECF Nos. 222, 224), and his motion to disqualify counsel (ECF No. 249).  (<u>Id.</u>)

## II.     DISCUSSION

At the relevant stages prior to his direct appeal, Derounian was represented by either Brian John Griffin or Steven Alan Metcalf II ("trial counsel").  On direct appeal, David J. Williams represented Derounian ("appellate counsel").  Derounian raises six grounds for relief in his petition, arguing that:

- (1)  The government "purposefully withheld exculpatory evidence" in violation of <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963) and that the government "fabricated evidence," Derounian Pet. at 4;

---

[14]     On July 25, 2024, Derounian untimely moved for an extension of time to respond to the Court's July 1, 2024, Order until July 26, 2024.  (ECF No. 257.)  The same day, the Court granted Derounian's request.  (Elec. Order dated Jul. 25, 2024.)

- (2) Trial counsel was constitutionally ineffective by failing "to conduct a reasonable investigation, which would have revealed the existence of an exculpatory forensic report," id. at 5;

- (3) Trial counsel was constitutionally ineffective when he failed to "challenge" the government's belief that Derounian had committed a murder during a January 16, 2018, bail argument, id.;

- (4) Trial counsel was constitutionally ineffective when he failed to interject during Derounian's plea colloquy with the Court, id.;

- (5) Trial counsel and appellate counsel were constitutionally ineffective when they did not object to the child pornography on the ground that most of the images were actually child erotica, id. at 7–8; and

- (6) Trial counsel and appellate counsel were constitutionally ineffective when they failed to object to the special conditions imposed by the Court at the time of Derounian's sentence, id. at 9.

The Court begins with a brief discussion of relevant legal principles before addressing each of Derounian's claims in turn.

## A.      Applicable Legal Principles

### 1.      Considerations for § 2255 Motions

A petitioner may collaterally attack his conviction and sentence by "mov[ing] the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). Relief under Section 2255 is generally available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995) (internal quotation marks omitted). "Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010) (internal quotation marks omitted).

One such rule is the "mandate rule," which prevents a petitioner from collaterally attacking his sentence when he has already tried and failed to attack it on the same grounds on direct appeal. See Yick Man Mui, 614 F.3d at 53; United States v. Sanin, 252 F.3d 79, 83 (2d Cir. 2001) (per curiam). "The mandate rule prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate." Id. In other words, "a Section 2255 petitioner may not relitigate questions which were raised and considered on direct appeal." Id. at 55 (internal quotation marks omitted). The mandate rule thus "bars the raising in a habeas proceeding of a claim when the events underlying the claim were the same as those underlying a claim raised and decided on the merits on direct appeal." Id. at 56. A habeas petitioner may not avoid this bar merely by offering "a slightly altered rearticulation of a claim that was rejected on his direct appeal." United States v. Pitcher, 559 F.3d 120, 124 (2d Cir. 2009) (per curiam) (internal quotation marks omitted).

Separately, if a habeas petitioner could have brought a claim on direct appeal, but failed to do so, the claim is barred as procedurally defaulted. See, e.g., United States v. Thorn, 659 F.3d 227, 231 (2d Cir. 2011). There are limited exceptions to this "procedural default" rule. The petitioner may premise a collateral attack on an argument he failed to raise on appeal if he "establishes (1) cause for the procedural default and ensuing prejudice or (2) actual innocence." Id. at 231; see also Bousley v. United States, 523 U.S. 614, 622 (1998).

As for the "cause-and-prejudice" gateway through procedural default, the Supreme Court has recognized that one form of "cause" that can overcome a procedural bar is constitutionally ineffective assistance of counsel.[15] See Yick Man Mui, 614 F.3d at 55 (citing Massaro v. United

---

[15] But merely "ignorant or inadvertent attorney error," such as counsel's failure to "recognize the factual or legal basis for a claim" or "to raise the claim despite recognizing it," will "not constitute cause for a procedural default." Murray v. Carrier, 477 U.S. 478, 486 (1986).

States, 538 U.S. 500, 508–09 (2003)).  So a petitioner may—as here—raise a claim of ineffective assistance of counsel for the first time in a § 2255 petition.  See Massaro, 538 U.S. at 504.

As for the "actual innocence ... gateway through" a procedural bar, the Supreme Court has "caution[ed] ... that tenable actual-innocence gateway pleas are rare."  McQuiggin v. Perkins, 569 U.S. 383, 386 (2013).  In the same vein, a petitioner's claim may still be reviewed in a collateral proceeding if he can establish that the constitutional error in his plea colloquy "has probably resulted in the conviction of one who is actually innocent."  Carrier, 477 U.S. at 496.  The Supreme Court has clarified that "'actual innocence' means factual innocence, not mere legal insufficiency. In other words, the [g]overnment is not limited to the existing record to rebut any showing that petitioner might make."  Bousley, 523 U.S. at 623–24 (internal citation omitted).  Thus, only on a showing that "in light of all the evidence" (including "new evidence" proffered by the petitioner or the government), "it is 'more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt,' [may] a petitioner ... invoke the actual innocence gateway and obtain review of the merits of his [procedurally defaulted] claims."  Doe v. Menefee, 391 F.3d 147, 162 (2d Cir. 2004) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)).

## 2.    Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution guarantees a criminal defendant's right to the assistance of counsel, see U.S. CONST. amend. VI, which the Supreme Court has held encompasses the right to effective assistance of counsel, see generally Strickland v. Washington, 466 U.S. 668 (1984).  A defendant in a criminal proceeding has a right under the Sixth Amendment to effective assistance from his attorney at all critical stages of the proceeding, including the entry of a guilty plea.  See, e.g., Hill v. Lockhart, 474 U.S. 52, 58 (1985) (holding "the two-part Strickland v. Washington test applies to challenges to guilty pleas based on ineffective assistance of counsel").  When challenging the effectiveness of counsel's assistance, a petitioner must show

that (1) counsel's representation "fell below an objective standard of reasonableness" measured against "prevailing professional norms," and (2) this "deficient performance prejudiced the defense" in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687–88, 694 (1984).  A court must reject a petitioner's ineffective assistance of counsel claim if it fails to meet either prong.  See Gonzalez v. United States, 722 F.3d 118, 130 (2d Cir. 2013) (citing Strickland, 466 U.S. at 697).

As for Strickland's performance component, "judicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689.  To meet the high bar for proving deficient performance, a habeas petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id.  This Court applies a "'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." Bell v. Cone, 535 U.S. 685, 702 (2002) (quoting Strickland, 466 U.S. at 689).  For example, "[a]ctions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel." Gibbons v. Savage, 555 F.3d 112, 122 (2d Cir. 2009) (citing Strickland, 466 U.S. at 690–91).  And "in case after case, [Second Circuit courts] have declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox or downright ill-advised." Tippins v. Walker, 77 F.3d 682, 686 (2d Cir. 1996).

Constitutionally inadequate performance may, however, be established if a habeas petitioner "shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Clark v. Stinson, 214 F.3d 315, 322 (2d Cir. 2000).  But nonetheless, "[t]he failure to include a meritless argument does not fall outside the wide range of

23

professionally competent assistance to which [a] [p]etitioner [i]s entitled." Aparicio v. Artuz, 269 F.3d 78, 99 (2d Cir. 2001) (internal quotation marks and citations omitted).  Simple disagreement with counsel's strategy is not enough on its own to support an ineffective assistance of counsel claim.  See United States v. Sanchez, 790 F.2d 245, 253 (2d Cir. 1986) ("A defendant ... may not claim ineffective assistance of counsel merely because ... he thinks counsel's trial strategy was inadequate.").

As for Strickland's prejudice component, an "error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 691).  Rather, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  While this prejudice component "does not require a showing that counsel's actions more likely than not altered the outcome," it does require a petitioner to show that "[t]he likelihood of a different result [was] substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 111–12 (2011) (internal quotation marks omitted); see also Garner v. Lee, 908 F.3d 845, 849, 862 (2d Cir. 2018); Waiters v. Lee, 857 F.3d 466, 469 (2d Cir. 2017); United States v. McCormick, 727 F. App'x 729, 731 (2d Cir. 2018); Perlaj v. United States, 2020 WL 3884443, at *4 (S.D.N.Y. Jul. 9, 2020) (Sullivan, J.).  In assessing prejudice, this Court reviews the record to determine the impact of the alleged ineffectiveness within the context of the entire case.[16]  See Berghuis v. Thompkins, 560 U.S. 370, 389 (2010) ("In assessing prejudice, courts

---

[16]      Moreover, "[t]he prejudice inquiry is ... ineluctably tied to the strength of the prosecution's evidence." Garner, 908 F.3d at 862.  "[A] verdict or conclusion with ample record support is less likely to have been affected by the errors of counsel than 'a verdict or conclusion only weakly supported by the record.'" Id. (quoting Waiters, 857 at 480). "As a result, '[e]ven serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt.'" Id. (quoting Lindstadt v. Keane, 239 F.3d 191, 204 (2d Cir. 2001)). Ultimately, "the Constitution does not entitle a petitioner to perfect representation." Terry v. Collado, 2023 WL 4086345, at *3 (E.D.N.Y. June 20, 2023) (citing United States v. Lane, 474 U.S. 438, 445 (1986)).

'must consider the totality of the evidence before the judge or jury.'") (quoting Strickland, 466 U.S. at 695).

In the specific context of guilty pleas, Strickland's prejudice component "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." Hill, 474 U.S. at 59. One way to satisfy the "prejudice" requirement is to "show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."[17] Id.; see also Kovacs v. United States, 744 F.3d 44, 51–52 (2d Cir. 2014) (discussing various ways that prejudice may be shown in the guilty plea context, including a forgone decision to proceed to trial or a more advantageous plea offer). In addition, a petitioner may show prejudice by demonstrating that he would have received and accepted a guilty plea with a lower sentence but for counsel's errors. See Missouri v. Frye, 566 U.S. 134, 147 (2012); see also Lafler v. Cooper, 566 U.S. 156, 174 (2012) (finding prejudice where the defendant showed that, but for counsel's deficient performance, there was a reasonable probability that the court would have accepted a guilty plea with a sentence less than a third of the length of the sentence he received after trial). Thus, with respect to plea bargaining, a defendant must show that "the outcome of the plea process would have been different with competent advice." Lafler, 566 U.S. at 163.

### 3. **Brady** Claims

Construing Derounian's pro se petition "to raise the strongest arguments [it] suggest[s]," Wright v. Comm'r of Internal Revenue, 381 F.3d 41, 44 (2d Cir. 2004), the Court finds that it raises a Brady claim. It is well-established by Brady v. Maryland and related authorities that in a criminal prosecution, "the government has an affirmative duty" under the Due Process Clause of the Fifth

---

[17]    In this regard, the "petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." Padilla v. Kentucky, 559 U.S. 356, 372 (2010). The Second Circuit "requires some objective evidence other than [petitioner's] assertions to establish prejudice." Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003) (citing United States v. Gordon, 156 F.3d 376, 380–81 (2d Cir. 1998)).

Amendment "to disclose favorable evidence known to it, even if no specific disclosure request is made by the defense." United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995); see generally Brady v. Maryland, 373 U.S. 83, 87 (1963); Giglio v. United States, 405 U.S. 150, 154 (1972). "There are three components of a true Brady violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82 (1999); see also United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001) (explaining that "favorable evidence" refers to both exculpatory and impeachment evidence). "In other words, true Brady material must be (1) favorable, (2) suppressed, and (3) prejudicial." United States v. Hunter, 32 F.4th 22, 31 (2d Cir. 2022).

"Evidence is favorable if it is either exculpatory or impeaching." United States v. Mahaffy, 693 F.3d 113, 127 (2d Cir. 2012) (citing Strickler, 527 U.S. at 281–82). Exculpatory material, often referred to as "Brady material," is information that "relates to the defendant's guilt or innocence." United States v. Ulbricht, 858 F.3d 71, 112 (2d Cir. 2017), abrogated on other grounds by Carpenter v. United States, 585 U.S. 296 (2018). Impeachment material, or "Giglio material," is evidence that "directly affects the credibility of a witness." United States v. Frank, 11 F. Supp. 2d 322, 325 (S.D.N.Y. 1998) (citing Giglio, 405 U.S. at 154).

Evidence is suppressed for Brady purposes "only if [the government] fails to disclose Brady and Giglio material in time for its effective use at trial or at a plea proceeding." Coppa, 267 F.3d at 146. "[T]he time required for the effective use of a particular item of evidence will depend on the materiality of that evidence ... as well as the particular circumstances of the case." Id. Under the suppression prong, there is "an exception to the disclosure obligation where the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence.'" United States v. Jackson, 345 F.3d 59, 73 (2d Cir. 2003)

26

(cleaned up); see also Leka v. Portuondo, 257 F.3d 89, 100 (2d Cir. 2001) ("Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.") (quoting United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982)).

Evidence is prejudicial under Brady if it is "material" to the defendant's guilt or punishment. Brady, 373 U.S. at 87; see also Hunter, 32 F.4th at 31. Materiality for these purposes turns on whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Stillwell, 986 F.3d 196, 200 (2d Cir. 2021) (internal quotation and citation omitted). The Supreme Court has elaborated that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Kyles v. Whitley, 514 U.S. 419, 434 (1995). The question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435.

The duty to fulfill these constitutional obligations necessarily falls on the prosecution, as it is "the prosecutor, who alone can know what is undisclosed, [who] must be assigned the responsibility to gauge the likely net effect of all such evidence." Id. at 420. As the Supreme Court has recognized, "the prudent prosecutor will resolve doubtful questions in favor of disclosure." United States v. Agurs, 427 U.S. 97, 108 (1976).

**B.     Application to Derounian's Claims**

As mentioned, Derounian's request for relief falls into two general categories: (1) first—that the government purposefully withheld exculpatory evidence, fabricated evidence, and made material misrepresentations to the Court; and (2) second—that his trial and appellate counsel were constitutionally ineffective for various reasons. (See generally Derounian Pet.) The Court

disagrees with Derounian on both scores.  Accordingly, for the below reasons, the Court denies Derounian's motion to vacate his conviction under 28 U.S.C. § 2255, without need for a hearing.

### 1.  No Evidentiary Hearing

To begin, the Court must first decide whether it can decide Derounian's petition based on the submitted record, or whether the Court must conduct an evidentiary hearing first.  "In ruling on a motion under § 2255, the district court is required to hold a hearing '[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" Gonzalez, 722 F.3d at 130 (quoting 28 U.S.C. § 2255).  But "the filing of a motion pursuant to § 2255 does not automatically entitle the movant to a hearing; that section does not imply that there must be a hearing where the allegations are 'vague, conclusory, or palpably incredible.'" Id. at 130–31 (quoting Machibroda v. United States, 368 U.S. 487, 495 (1962)).  A hearing is necessary only where the petition "set[s] forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the movant] to relief."  Id. at 131.

Even if a hearing is warranted, "[i]t is within the district court's discretion to determine the scope and nature of a hearing."  Raysor v. United States, 647 F.3d 491, 494 (2d Cir. 2011) (citing Chang v. United States, 250 F.3d 79, 85–86 (2d Cir. 2001)).  Courts need not hold a full testimonial hearing where "the testimony of [petitioner] and his trial counsel would add little or nothing to the written submissions."  Chang, 250 F.3d at 86.  Courts often "consider the 'trial record, letters, documents, exhibits, affidavits and written interrogatories' and may adopt a 'middle road' approach, declining to hold a hearing and 'deciding disputed facts on the basis of written submissions.'" Rosario v. United States, 2019 WL 5260784, at *3 (S.D.N.Y. Oct. 17, 2019) (quoting Pham v. United States, 317 F.3d 178, 184 (2d Cir. 2003)).

In this Court's view, the submitted record is sufficient for the Court to decide the issues raised in Derounian's petition.  As a result, the Court finds that a testimonial evidentiary hearing would add "little or nothing" to the Court's adjudication of Derounian's habeas claims.  <u>Chang</u>, 250 F.3d at 86.

For the first time in reply to his habeas petition, however, Derounian argues the Court should conduct an evidentiary hearing on an issue related to his plea and conviction: whether the forensic examination of the electronic evidence seized from his residence reveals child pornography, and relatedly, whether the government fabricated the claims of his child pornography possession.  (Derounian Rep. at 8; <u>see also</u> Mot. to Disqualify Counsel at 9, 12.)  Although his submissions are at times difficult to parse, Derounian's theory is as follows: (1) Forensic Computer Analyst Zachary Greenwood generated a forensic report of the two external USB thumb drives recovered from his residence on September 12, 2016, which was "deliberately withheld" from to his trial counsel; (2) Analyst Greenwood's forensic examination establishes that the USB drives "contained no child pornography;" (3) Analyst Greenwood's forensic conclusion has been "affirmed in several responses to" Derounian's many FOIA requests; (4) and thus the USB thumb drives must have been "deliberately altered" by the government after the time they were examined by Analyst Greenwood.  (<u>See</u> Mot. to Disqualify Counsel at 3; <u>see</u> <u>also</u> TRO Mot. at 5–6.)  In addition, Derounian contends that if he possessed images of children, they constituted child erotica instead of child pornography.  So to Derounian's mind, an evidentiary hearing is necessary.  (<u>See</u> <u>id.</u> at 4.)

To begin with, Derounian did not make these arguments in his opening memorandum in support of his petition.  Generally, courts do not consider arguments raised for the first time in a reply brief, and this rule applies in the context of habeas petitions.  <u>See</u> <u>Tardif v. City of N.Y.</u>, 991 F.3d 394, 404 n.7 (2d Cir. 2021) ("[I]ssues raised for the first time in a reply brief are generally

deemed waived."); see also Lallave v. Martinez, 609 F. Supp. 3d 164, 182 (E.D.N.Y. 2022) (declining to consider claims raised for the first time in reply to a habeas petition); Roberts v. United States, 2018 WL 1582288, at *2 (E.D.N.Y. Mar. 30, 2018) (same); Melo v. United States, 825 F. Supp. 2d 457, 464 (S.D.N.Y. 2011) (same). Such a rule is meant to "deter[ ] the practice of raising new arguments on reply that the opposing party is unable to respond to." Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n, 324 F. Supp. 3d 387, 395 (S.D.N.Y. 2018). Thus, the Court considers Derounian's request for an evidentiary hearing to be waived.

In any case, to the extent Derounian argues that he is entitled to his requested evidentiary hearing, the Court finds that argument unpersuasive. As discussed below, there are no disputed material facts surrounding his guilty plea and conviction that need to be resolved to determine that Derounian is not entitled to habeas relief.[18] See Santone v. Fischer, 689 F.3d 138, 155–56 (2d Cir. 2012). Put differently, "even with the benefit of an evidentiary hearing, [Derounian] could not develop a factual record that would entitle him to habeas relief." Schriro v. Landrigan, 550 U.S. 465, 475 (2007). Accordingly, the Court need not grant Derounian's request for an evidentiary hearing because it is not necessary to resolve the petition. Conducting a hearing would be an empty gesture and a waste of judicial resources.

---

[18]     As explained below, Derounian mischaracterizes the many responses to his FOIA requests. None of them establish—let alone posit—that the USB thumb drives contained no child pornography. (See, e.g., Exs. U, AA, ECF No. 206.) Moreover, it is clear from the record that Derounian's claims of government fabrication evidence are wholly without merit. (See ECF No. 255.) And Derounian's claim that the USB drive images are not child pornography are contradicted by the detailed descriptions of those images contained in the affidavit of Search Warrant #2 and the PSR. (See PSR ¶ 23; see also Ex. B, ECF No. 255-2 ("Search Warrant #2").) These descriptions, coupled with the undersigned's own review of the images, make clear that Derounian's assertion is not based in fact.

2. **Derounian's Claims That the Government Purposefully Withheld Exculpatory Evidence, Fabricated Evidence, and Made Material Misrepresentations to the Court**

        a)    *Ground 1*

Derounian's first ground for relief is that the government purposefully withheld exculpatory evidence and fabricated evidence in violation of his due process rights.[19] (Derounian Pet. at 4.) For two reasons, the Court finds Derounian's Ground 1 claims to be unavailing. First, Derounian's claims for vacatur of his conviction are procedurally barred. And second, his claims also fail on the merits.

        (1)    Derounian's Claims are Barred for Unexcused Procedural Default

To begin with, Derounian's <u>Brady</u> and fabrication of evidence claims are procedurally barred.[20] It is well settled that a § 2255 petition is not a substitute for a direct appeal. <u>See</u> <u>United States v. Frady</u>, 456 U.S. 152, 165 (1982); <u>see also</u> <u>United States v. Vilar</u>, 645 F.3d 543, 548 (2d Cir. 2011). A petitioner cannot use a § 2255 petition to litigate questions that could have been raised on direct appeal but were not. <u>See</u> <u>Sapia v. United States</u>, 433 F.3d 212, 217 (2d Cir. 2005). Except for claims for ineffective assistance of counsel, <u>see</u> <u>Massaro v. United States</u>, 538 U.S. 500,

---

[19]    Although Derounian makes no mention of the Fifth Amendment' Due Process Clause in his papers, this Court construes his <u>pro se</u> petition liberally "to raise the strongest arguments [it] suggest[s]." <u>Wright</u>, 381 F.3d at 44. Considering Derounian's <u>pro se</u> status, Court construes his petition to raise a <u>Brady</u> claim under the Due Process Clause of the Fifth Amendment. <u>See</u> <u>Coppa</u>, 267 F.3d at 140 ("<u>Brady</u> and its progeny are grounded in the Due Process Clauses of the Constitution.") (citing <u>United States v. Bagley</u>, 473 U.S. 667, 675 (1985)). As for Derounian's fabrication of evidence claim, the Court need not attempt to characterize it because—as explained below—the claim is completely belied by the record, meritless, and subject to summary dismissal. <u>See</u> <u>Blackledge v. Allison</u>, 431 U.S. 63, 74 (1977) ("The … presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.").

[20]    While it does not do so lightly, this Court may raise the issue of procedural default <u>sua sponte</u>. <u>See</u> <u>Mitchell v. Miller</u>, 2009 WL 2924310, at *5 n.12 (S.D.N.Y. Sept. 10, 2009) (noting that "[t]he Second Circuit has held that a district court should raise a procedural default issue <u>sua sponte</u> unless one of four exceptions applies to the circumstances of the habeas petition," none of which apply in the present case (citing <u>Washington v. James</u>, 996 F.2d 1442, 1451 (2d Cir. 1993)); <u>see also</u> <u>Rosario v. United States</u>, 164 F.3d 729, 732 (2d Cir. 1998); <u>Jiang v. Larkin</u>, 2016 WL 1718260, at *24 n.7 (S.D.N.Y. Apr. 28, 2016). In any event, as explained below, the Court also rejects Derounian's petition on its merits.

505–06 (2003); see also Zhang v. United States, 506 F.3d 162, 166 (2d Cir. 2007), a petitioner who has procedurally defaulted on a claim by failing to raise it on direct appeal can raise the claim under § 2255 only if the petitioner can demonstrate (i) cause for the failure to raise the claim earlier and prejudice from the alleged error, or (ii) actual innocence of the crime. See Bousley, 523 U.S. at 622–23. Accordingly, the Court may not reach the merits of the claims Derounian raises in Ground 1 unless he can "first demonstrate either 'cause' and actual 'prejudice,'" Bousley, 523 U.S. at 622 (quoting Carrier, 477 U.S. at 485; and Wainwright v. Sykes, 433 U.S. 72, 87 (1977)), "or that he is 'actually innocent,'" id. (quoting Carrier, 477 U.S. at 496; and Murray, 477 U.S. at 537). As explained below, neither of these "gateway[s]" is available to Derounian on Ground 1. Perkins, 569 U.S. at 386.

(a)      Cause and Prejudice

As for cause, Derounian's burden is to show that his default was the result of "some objective factor external to the defense." Carrier, 477 U.S. at 488. That he cannot do. As explained in greater detail in the following section addressing the merits of his claims, Derounian fails to identify any Brady or fabrication of evidence error. See infra, Section II.B.2.a.2. It follows, a fortiori, that Derounian cannot show his default was the result of "some objective factor external to the defense" when the external "factor" upon which he relies is a palpably incredible allegation that is wholly unsupported by the record. See Carrier, 477 U.S. at 488.

As for prejudice, Derounian's burden is to show that his otherwise-procedurally defaulted claims of error go to "an error" that "not merely ... created a possibility of prejudice, but ... worked to his actual and substantial disadvantage." Frady, 456 U.S. at 170 (emphases in original). Again, as explained below, Derounian fails to identify any Brady or fabrication of evidence error. See infra, Section II.B.2.a.2. Here too, it follows that if Ground 1's putative claims of error are not

errors at all, they could not possibly be so egregious as to "infect[ ] his entire [case] with error of constitutional dimensions." Frady, 456 U.S. at 170.

### (b)   Actual Innocence

Because Derounian cannot "show cause and prejudice" "with respect to" Ground 1, he "must make a showing of actual innocence" in "order to obtain ... habeas review of [those] procedurally defaulted claim[s]." Williams, 2022 WL 685497, at *4 (Sullivan, J.).  He cannot do so.  Derounian admitted under oath that he "possessed more than ten images of individuals under the age of 12 that were sexual in nature … with use of the computer."  (A 153–54.)  He has not overcome the "strong presumption of verity" of his statement under oath during his allocution. Gonzalez, 722 F.3d at 131; see also United States v. Hernandez, 242 F.3d 110, 112 (2d Cir. 2001) (per curiam).  And as explained in greater detail in the following section addressing the merits of his claims, Derounian's theory of innocence is conclusory, palpably incredible, and wholly unsupported by the record.  See infra, Section II.B.2.a.2.

### (2)   Derounian's Claims Fail on the Merits

As it happens, Derounian's claims for vacatur of his conviction also fail on the merits. Before addressing the claims individually, the Court pauses to note that Derounian's knowing and voluntary guilty plea to Counts One and Three would appear to be another impediment to his ability to bring these claims.  That is, a guilty plea "conclusively resolves the question of factual guilt supporting the conviction," so "on collateral attack of a judgment of conviction, ... a petitioner may not assert pre-plea constitutional violations bearing on the valid establishment of his factual guilt."  United States v. Gregg, 463 F.3d 160, 164 (2d Cir. 2006) (per curiam); see United States v. Torres, 129 F.3d 710, 715 (2d Cir. 1997).  "Rather, a defendant may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within acceptable standards." Torres, 129 F.3d at 715–16 (internal quotation marks and citation

omitted).   Even  still,  the  Court  proceeds  to  consider  the  merits  of  Derounian's  <u>Brady</u>  and

fabrication of evidence claims.

(a)      <u>Brady</u> Claim

First, Derounian argues that the government "purposefully withheld exculpatory evidence"

in violation of <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963).  (Derounian Pet. at 4.)  A full and fair

review of the record reveals that the government did no such thing.

(i)      *The Record*

On June 28, 2016, Derounian was arrested at his residence in Sea Cliff, New York on fraud

charges relating to the estate of Jane Doe.  (PSR ¶ 23.)  At the time of Derounian's arrest, law

enforcement agents executed a search warrant at his residence ("Search Warrant #1").[21]  (Gov't

Derounian  Supl.  Opp.  at  2.)   Under  Search  Warrant  #1,  agents  recovered  and  then  analyzed

numerous electronic devices.  (<u>Id.</u>)  United States Postal Inspection Service ("USPIS") members

documented the items seized—which included a USB drive with serial number BB0903NQVB

recovered from Derounian's bedroom ("USB Drive").[22]  (Ex. A at 6, ECF No. 255-1 ("Inventory

Report").)  On the same day as Derounian's arrest, law enforcement seized the USB Drive.  (Gov't

Derounian Supl. Opp. at 2.)  Shortly thereafter, law enforcement reviewed the USB Drive as it

pertained to Derounian's fraud charges.  (<u>Id.</u>)  During that search, law enforcement discovered

fourteen images of what appeared to be child pornography.  (<u>Id.</u>)  Upon their discovery, law

enforcement ceased their review of the USB Drive and applied for a second search warrant

("Search Warrant #2").  (<u>Id.</u>)

---

[21]      Search Warrant #1 pertained to Derounian's fraud charge, not child pornography.  (Gov't Derounian Supl. Opp. at 2 n.1.)

[22]      The USB Drive is listed on page six-of-ten in the Inventory Report, with the following description: "1 x Corner Office 1GB USB Drive (BB903NQVB)[.]"  (Inventory Report at 6.)

34

On August 17, 2016, United States Magistrate Judge Steven I. Locke signed Searched Warrant #2, which authorized law enforcement to search all the devices recovered from Derounian's home—including the USB Drive—for child pornography.  (See Ex. B, ECF No. 255-2 ("Search Warrant #2"); see also Ex. C, ECF No. 255-3 ("Search Warrant #2 Supporting Affidavit").)  The Search Warrant #2 Supporting Affidavit—signed by Special Agent Michael Cassidy of the United States Attorneys' Office—provided descriptions of five images contained on the USB Drive:

- (1) "**Image4.jpeg** is an image file that contains six sexually explicit photos of a prepubescent female. Three of the photos depict an adult male penetrating or attempting to penetrate the prepubescent female's genitals with his penis. One photo depicts the prepubescent female performing oral sex on an adult male's penis.  One photo depicts an adult male digitally penetrating the prepubescent female's anus.  One photo depicts an adult male's hands spreading the genitalia of the prepubescent female," Search Warrant #2 Supporting Affidavit at ¶ 7;

- (2) "**lmage5.jpeg** is an image file that contains eight sexually explicit photos of a prepubescent female. Two of the photos depict the prepubescent female performing oral sex on an adult male's penis. Two of the photos depict an adult man attempting to digitally penetrate or digitally penetrating the prepubescent female's anus. One of the photos depicts an adult male attempting to penetrate the prepubescent female's anus with his penis. Two of the photos depict the prepubescent female attempting to penetrate her anus with the adult male's penis. One photo depicts the prepubescent female naked looking down.," id.;

- (3) "**Image7.jpeg** is an image file that depicts a prepubescent female's genitals being penetrated by an adult male's penis," id.;

- (4) "**Imagel0.jpeg** is an image file that depicts a prepubescent female attempting to penetrate herself with an adult male penis," id.; and

- (5) "**Image11.jpeg** is an image file that depicts an adult male attempting to penetrate a prepubescent female's genitals with his penis," id.

Shortly after Magistrate Judge Locke signed Search Warrant #2, the electronic devices—including the USB Drive—were transported to USPIS's Forensic Examination Laboratory ("Lab").  (Gov't Derounian Supl. Opp. at 3.)  On September 12, 2016, the Lab transmitted a forensic examination

report of the electronic devices—including the USB Drive ("Forensic Report").  (Ex. D., ECF No. 255-4 ("Forensic Report").)  The Forensic Report contains the following preliminary findings about the USB Drive:

> "**Exhibit 15-27** is a Corner Office USB with a capacity of 1GB.  The exported data for this exhibit is stored on 'Findings Disc 1 of 2.'  In order for the links below to operate, ensure the correct Findings Disc is inserted or connected.
>
> Pictures
> Potentially relevant pictures were found on the device.  The pictures and their respective metadata were exported for review.  Click here to view the report.
>
> Documents
> Potentially relevant documents were found on the device.  The documents and their respective metadata were exported for review.  Click here to view the report.
>
> File Listing
> A file listing with details about the exported files has been exported for review.  Click here to view the file listing.
>
> **Note**:  File listing details, descriptive information such as, but not limited to, the file name, modified, accessed, created times, deleted status, hash value, file path, and embedded metadata."

(Forensic Report at 4.)

Based on the results of the Forensic Report, Postal Inspector Hope Cerda reviewed the USB drive and found around 514 images of child pornography.  (Gov't Derounian Supl. Opp. at 4; see also Sentencing Tr. at 8 ("[T]he postal inspector knew there were hundreds of images.").)

After Derounian's June 25, 2018 guilty plea to—among other things—possessing child pornography, USPIS members made the USB Drive's images available to United States Probation Officer Victoria Main.  (Id.)  Probation Officer Main—separate and apart from the USPIS—determined that Derounian possessed around 514 images of child pornography.  (Id.)  Probation Officer Main generated Derounian's PSR and described a few images as follows:

36

| Image of Child Pornography | Description of Content |
|---|---|
| 1 | A clothed prepubescent boy (age 6-8) holding an erect male penis to his mouth. |
| 2 | A nude prepubescent boy (age 10-12) being anally penetrated by an erect adult male's penis. |
| 3 | A nude toddler/infant female's genital area. |
| 4 | A clothed prepubescent female (age 6-8) performing oral sex on an erect adult penis. |
| 5 | A nude prepubescent female (age 8-10) with 3 nude adult males.  One male is holder her hand, another is touching her breast, and she is holding on to the 3rd male's penis. |
| 6 | A nude postpubescent female with an adult male hand (covered in what appears to be blood) holding her leg so that her genitals are exposes.  A large amount of what appears to be blood is in and around her vaginal opening. |
| 7 | A nude female toddler being anally penetrated by an erect adult penis. |

(See PSR ¶ 23.)

On May 2, 2019, before Derounian's sentencing, Postal Inspector Cerda brought a secured laptop to my chambers in Brooklyn, New York so the undersigned could review the USB Drive's images. (Gov't Derounian Supl. Opp. at 5) (appending picture of Postal Inspector Cerda's calendar entry from that day that reads "Judge Azrack in BK for Derounian").)

At Derounian's sentencing, this Court highlighted—among other considerations—the more than "500 images of child pornography … [recovered] from Derounian's computer equipment, depicting pre and post pubescent females[,] …males, infants[,] and toddlers." (Sentencing Tr. at 43:16–20.)   Absolving any doubt about their contents, the undersigned explained: "I have personally reviewed all of these images.  In my view this offense is more serious than some other child pornography cases, as the images on the defendant's computer depicted toddlers and infants being sexually abused."  (Id. at 43:20–24.)

The government also placed on the record at sentencing that Derounian's own trial counsel had been given access to—and then reviewed—the child pornography images prior to his client's sentencing hearing.  (Id. at 8:22 ("Mr. Metcalf also reviewed the images.").)  Derounian's trial counsel did not dispute that fact.  (See id.)

In sum—as described above—there is a documented record of: (1) how the USB Drive images were discovered during the execution of Search Warrant #1; (2) how law enforcement inventoried the electronic devices—including the USB Drive; (3) how Search Warrant #2 described the probable cause leading to the recovery of the more than 500 images on the USB Drive; (4) how the Forensic Report provided to Postal Inspector Cerda directed her to review the USB Drive, which she did along with other members of law enforcement; and (5) how the following additional people reviewed the images on the USB Drive: (i) AUSA Misorek; (ii) Probation Officer Main; (iii) trial counsel; and (iv) the undersigned.  Accordingly, the record definitively shows that child pornography images on the USB Drive existed.

(ii)     *Derounian's Theory*

Derounian's claim to the contrary is palpably incredible and wholly without merit. Derounian's theory of harm is as follows: (1) Forensic Computer Analyst Zachary Greenwood generated a forensic report of the two external USB thumb drives recovered from his residence on September 12, 2016, which was "never disclosed" to his trial counsel; (2) Analyst Greenwood's forensic examination establishes that the USB drives "contained no child pornography;" (3) Analyst Greenwood's forensic conclusion has been "affirmed in several responses to" Derounian's many FOIA requests; (4) and thus the USB thumb drives must have been "deliberately altered" by the government after the time they were examined by Analyst Greenwood.  (TRO Mot. at 5–6.) Not only does each aspect of Derounian's theory flout the above-described record, but he mischaracterizes several of the documents on which he relies.

As for his claim that Analyst Greenwood's forensic examination establishes that the USB drives "contained no child pornography," Derounian contends that he "was able to obtain a copy of Greenwood's forensic report from the Executive Office for United States Attorney's via a request pursuant to the Freedom of Information Act," which confirmed his suspicion.  (Derounian Pet. at 31.)  Tellingly, however, Derounian's petition attaches only the cover letter to the Forensic Report—not any of its enclosures.  (See Ex. S, Derounian Pet.)  Thus, Derounian cannot credibly claim that Analyst Greenwood's forensic examination establishes that the USB drives contained no child pornography.  A fair reading of the Forensic Report supports the opposite conclusion.  (See Ex. D, ECF No. 255-4.)

As for his claim that Analyst Greenwood's forensic "conclusion" has been "affirmed in several responses to" Derounian's FOIA requests, Derounian clearly mischaracterizes such responses.  On June 6, 2022, Derounian sent a FOIA request to the United States Postal Service General Counsel's Office seeking:

> "The actual number of images that Mr. Greenwood's forensic analysis discovered pursuant to his examination of the two (2) thumb drives listed on page 4 of his forensic report."

(Derounian Pet. at 32 (citing Ex. T).)

On June 13, 2022, Derounian received the following response from the General Counsel's Office:

> "A search was conducted of the Postal Inspection Service records at the National Headquarters, as well as those records at the Forensic Laboratory Unit. You are advised that the Postal Laboratory Service has no record of the actual number of images that Mr. Greenwood's forensic analysis discovered pursuant to his examination of the two (2) thumb drives listed on page 4 of his forensic report."

(Id. (citing Ex. U).)

Derounian seizes upon the language "no record of the actual number of images" to support his argument that Analyst Greenwood's forensic analysis of the USB thumb drives reveals no child pornography.  (Id.)  But Derounian takes the FOIA response's language out of context.  Nothing therein establishes—let alone even posits—that the USB thumb drives contained no child pornography.  Clearly, Derounian mischaracterizes the United States Postal Service General Counsel's Office response to his FOIA request.  As such, his claim that the government must have "deliberately altered" the USB thumb drives is equally discredited.

(iii)    <em>Merits</em>

Turning to the merits, Derounian's Brady claim easily fails.  As discussed above, "[t]here are three components of a true Brady violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued."  Strickler, 527 U.S. at 281–82; see also Coppa, 267 F.3d at 135 (explaining that "favorable evidence" refers to both exculpatory and impeachment evidence).  "In other words, true Brady material must be (1) favorable, (2) suppressed, and (3) prejudicial."  Hunter, 32 F.4th at 31.

"Evidence is favorable if it is either exculpatory or impeaching."  Mahaffy, 693 F.3d at 127. (citing Strickler, 527 U.S. at 281–82).  The Forensic Report is neither—it's inculpatory.  So Derounian's Brady claim fails on the merits on this ground alone.

(b)      Fabrication of Evidence Claim

Second, Derounian claims that the government "fabricated evidence" in violation of his rights.  (Derounian Pet. at 4.)  As explained in detail above, this claim is also belied by the record.  AUSA Misorek did not fabricate any evidence here.  Accordingly, the Court finds Derounian's claim to be baseless and subject to summary dismissal.  See Blackledge, at 74 ("The …

presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.")

*     *     *

For the above reasons, the Court concludes that Derounian's <u>Brady</u> and fabrication of evidence claims provide no basis for habeas relief.  His claims are procedurally barred, and they fail on their merits in any event.

### 3.    Ineffective Assistance of Counsel

Citing five grounds for relief, Derounian next argues he was denied his Sixth Amendment right to effective assistance of trial and appellate counsel.  (Derounian Pet. at 5–9.)  The Court disagrees again.

### a)    *Ground 2*

Derounian first argues that his trial counsel was constitutionally ineffective because he failed "to conduct a reasonable investigation, which would have revealed the existence of an exculpatory forensic report." (Derounian Pet. at 5.)  The Court disagrees and finds that Derounian has failed to meet either component of the <u>Strickland</u> test with respect to this argument.

As for <u>Strickland</u>'s performance component, the Court cannot conclude that trial counsel's conduct fell below an objective standard of reasonableness.  Trial counsel appropriately sought and received all discovery in his client's prosecution—which included, among other things, around 2,466 pages of documents, a CD containing search warrant returns, a CD containing PayPal subpoena returns, a CD containing Derounian's 911 call, and a CD containing Derounian's video confession.  (<u>See</u> ECF No. 13.)  And at sentencing, the government placed on the record that Derounian's trial counsel had been given access to and reviewed the images of child pornography before Derounian's sentence—a fact that trial counsel did not dispute.  (Sentencing Tr. at 8:20–25.)  Accordingly, applying the "'strong presumption' that counsel's conduct falls within the wide

range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight," this Court finds that Derounian fails to show his trial counsel's conduct fell below an objective standard of reasonableness.[23]  Bell, 535 U.S. at 702 (quoting Strickland, 466 U.S. at 689).

Even if trial counsel's actions were somehow unreasonable, which they were not, Derounian fails meet Strickland's prejudice component.  As explained in detail above, the Forensic Report to which Derounian refers was inculpatory rather than exculpatory.  (See supra, Section II.B.2.)  That dooms his ineffective assistance of counsel claim, as there is no basis to conclude that Derounian has established a "substantial" likelihood of a different result at sentencing.  Garner, 908 F.3d at 871 (quoting Harrington, 562 U.S. at 112); see also Lindstadt, 239 F.3d at 204 (finding errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt).

Nor can Derounian show prejudice if his claim is instead viewed as ineffective assistance during the guilty plea process.  Derounian "has not alleged, let alon[e] shown a reasonable probability, that with better assistance he would have received a better plea deal or otherwise exercised his right to proceed to trial, and so provides no basis to infer prejudice."  Cardenas v.

---

[23]      It bears mentioning that while of course "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," counsel need not "investigate comprehensively every lead or possible defense."  Yannai v. United States, 346 F. Supp. 3d 336, 347 (E.D.N.Y 2018) (quoting Strickland, 466 U.S. at 691).  A reasonable decision to forego investigation may be based on, for example, "a reasoned judgment that such investigation would be fruitless, wasteful, or even counterproductive."  Espinal v. Bennett, 588 F. Supp. 2d 388, 399 (E.D.N.Y. 2008), aff'd, 342 F. App'x 711 (2d Cir. 2009) (citation omitted).  Specifically, reasonable decisions not to pursue an avenue of investigation encompass cases "where counsel ... cease[d] further investigation as a result of having discovered ... evidence ... to suggest that challenging the prosecution's ... evidence would have been counterproductive, or that further investigation would have been fruitless," or where counsel has "good reason to think further investigation would be a waste."  Gersten v. Senkowski, 426 F.3d 588, 610 (2d Cir. 2005) (internal citations and quotation marks omitted).  Relevant here, the duty to reasonably investigate does not "compel counsel … to scour the globe on the off-chance something will turn up."  Greiner v. Wells, 417 F.3d 305, 321 (2d Cir. 2005) (internal citations and quotation marks omitted)).  Thus, "[p]ost-hoc complaints about the strategy or tactics employed by trial counsel, or complaints that trial counsel did not conduct a sufficiently vigorous pretrial investigation, are typically found to be insufficient to satisfy Strickland."  LaMarco v. United States, 336 F. Supp. 3d 152, 168 (E.D.N.Y. 2018).  Moreover, "a court reviewing a claim for ineffective assistance of counsel is not permitted to 'use hindsight to second guess [counsel's] strategy choices.'"  Baran v. United States, 160 F. Supp. 3d 591, 596 (S.D.N.Y. 2016) (quoting Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994)).

United States, 2022 WL 121338, at *4 (S.D.N.Y. Apr. 25, 2022) (Nathan, J.) (citing Saxon v. United States, 2016 WL 3766388, at *10, *12 (S.D.N.Y. July 8, 2016), aff'd, 695 F. App'x 616 (2d Cir. 2017)); see also Hill, 474 U.S. at 59 (holding petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."). Here, the evidence against Derounian "was overwhelming, and he avoided considerable sentencing exposure through his plea agreement." United States v. Gali, 2023 WL 8886606, at *7 (E.D.N.Y. Dec. 26, 2023). Under these circumstances, rejecting the plea agreement would have been irrational, and that dooms Derounian's claim.

b)    *Ground 3*

Derounian next argues that his trial counsel was constitutionally ineffective when he failed to "challenge" the government's belief that Derounian had committed a murder during a January 16, 2018, bail argument. (Derounian Pet. at 5.) Here too, the Court finds that Derounian fails to satisfy either component of the Strickland test with respect to this argument.

As for Strickland's performance component, the Court again cannot conclude that trial counsel's conduct fell below an objective standard of reasonableness. Trial counsel made at least five bail applications to this Court on Derounian's behalf. (ECF Nos. 52, 62, 66, 69, 73.) At one point, trial counsel succeeded in procuring Derounian's release. (ECF No. 53.) Against that backdrop, and again "indulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Harrington, 689 F.3d at 129 (quoting Strickland, 466 U.S. at 689), the Court cannot conclude that trial counsel's actions at Derounian's bail proceedings were objectively unreasonable. Indeed, "[a]ctions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel." Gibbons, 555 F.3d at 122 (citing Strickland, 466 U.S. at 690–91). Here, Derounian has not rebutted the "'strong

43

presumption'" that trial counsel's actions were reasonable strategic decisions.  Bell, 535 U.S. at 702 (quoting Strickland, 466 U.S. at 689).

Even if the Court assumed trial counsel acted unreasonably, which he did not, Derounian cannot demonstrate prejudice.  As mentioned, Derounian must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  "The likelihood of a different result must be 'substantial.'"  Garner, 908 F.3d at 871 (quoting Harrington, 562 U.S. at 112).  Here, even if trial counsel challenged the government's assertion that Derounian had committed a murder during the January 31, 2018 bail argument, and even if the Court sustained the objection, "there is simply no basis [to conclude] that he has established anything close to a substantial likelihood of a different result" at sentencing.  Id. (emphasis in original); see also Sentencing Tr. at 41:23–25 ("[T]he defendant is not before this court charged with a murder and the court will not consider it as such….").

Nor can the Court conclude that any of its bail determinations—or any of trial counsel's alleged "errors" committed therein—prejudiced Derounian so much that they affected the outcome of his plea process.  Derounian "has not alleged, let alon[e] shown a reasonable probability, that with better assistance he would have received a better plea deal or otherwise exercised his right to proceed to trial, and so provides no basis to infer prejudice."[24]  Cardenas, 2022 WL 121338, at *4 (Nathan, J.) (citing Saxon, 2016 WL 3766388, at *10, *12, aff'd, 695 F. App'x 616 (2d Cir. 2017)); see also Hill, 474 U.S. at 59 (holding petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going

---

[24]     Even if Derounian's petition could be construed to claim he would have a received a better plea deal or went to trial with better assistance, which it cannot, the Second Circuit "requires some objective evidence other than [petitioner's] assertions to establish prejudice."  Pham, 317 F.3d at 182 (citing Gordon, 156 F.3d at 380–81).  That certainly does not exist here.

to trial."). Moreover, the evidence against Derounian "was overwhelming, and he avoided considerable sentencing exposure through his plea agreement." Gali, 2023 WL 8886606, at *7. Under these circumstances, rejecting the plea agreement would have been irrational, and that dooms Derounian's claim here too.

c)   *Ground 4*

Derounian's fourth ground for relief is that his trial counsel was constitutionally ineffective when he failed to interject during Derounian's plea colloquy with the Court. (Derounian Pet. at 5.) Derounian appears to suggest that he was improperly induced to plead guilty by the Court. (Id.) The Court finds that Derounian fails to meet Strickland's performance component with respect to this ground for relief.

As for Strickland's performance component, Derounian's claim that he was improperly induced to plead guilty by the Court is belied by the record. At the plea hearing, Derounian acknowledged that he understood the rights he would be giving up by entering into the plea agreement and by pleading guilty. (A 138–42.) Derounian was advised by then-Magistrate Judge Brown that the estimated Guidelines computation contained in the plea agreement was not a guarantee of a specific sentence. Indeed, Derounian's counsel pointed out that there were lingering questions about some of the details of the plea agreement (A 137–38), that it was highly likely that Derounian's criminal history category was higher than the Category II indicated in the plea agreement, and that he had discussed that possibility with Derounian:

| Court: | . . . Has your attorney discussed the sentencing guidelines and the other sentencing factors that go into formulating a sentence? Have you discussed that? |
|---|---|
| Defendant: | He has. |
| Court: | So then you should understand, sir, that the sentencing guidelines which are estimated here |

|  | are not mandatory, but that in sentencing the Court is required to consider the applicable guideline range along with the statutory factors listed in [18 U.S.C. § 3553(a)]. And what that means is the Court will consider the nature and circumstances of the offense and your criminal history and your personal characteristics in developing a sentence. You understand that, yes? |
|---|---|
| Defendant: | I do. |
| [Counsel]: | Your Honor, may I just address one issue in those regards? |
| Court: | Sure. |
| [Counsel]: | As part of the agreement, the guidelines that have been calculated have been calculated as a category two. Both [myself and the AUSA] believe that that is not the circumstances as to where he would fall. And we have discussed in detail of him being of a higher category and these guidelines being on a little bit more of a higher end when we actually get past and are actually preparing for sentencing. |
| Court: | Okay.  Do you understand, sir? |
| Defendant: | I do. |
| Court: | Here's the thing. At the end of the day, the guidelines, they're all estimates. |
| Defendant: | Right. |
| Court: | (A), they could be wrong. (B), the judge doesn't necessarily—she has to consider them but she doesn't have to follow them at the end of the day anyway.  So the guideline estimates, they're not a guarantee.  Do you understand that? |
| Defendant: | I understand. |

| | |
|---|---|
| Court: | The only guarantee you have here is twofold. Number one, you have the right to appeal if it's more than 71 months. You understand that? |
| Defendant: | I do. |
| Court: | The second only guarantee as to how high your sentence could be is that statutory cap which is the 40 years I mentioned. That's really your only guarantee. Do you understand? |
| Defendant: | I do. |
| Court: | Do you recognize, sir, that if the penalty or the sentence imposed is more severe than you expect, you will not be able to withdraw your guilty plea. Do you understand that? |
| Defendant: | I do. |
| Court: | You should know also that in formulating a sentence the District Court will consider other factors including the seriousness of the offense, just punishment, protection of the public from additional criminal conduct by you or by others. Do you understand? |
| Defendant: | I do. |
| Court: | Do you have any questions you'd like to ask me about the charge, your rights, the sentence, anything? |
| Defendant: | No, Your Honor. |

(A 149–50) (emphasis added).)

Magistrate Judge Brown also determined that Derounian was not under some misunderstanding that he had received a promise of a specific sentence:

| | |
|---|---|
| Court: | Has anyone made you a promise as to what your sentence is going to be? |
| Defendant: | Not at all. |

| | |
|---|---|
| Court: | Understand it's your lawyer's job to give you an estimate. He can say based on my experience I think this, I think that. But that's not a promise and I think you know the difference. |
| Defendant: | I understand. |
| Court: | Right?  Yes? |
| Defendant: | I understand that. |

(A 152.)

Importantly, the Court takes Derounian's affirmations at his guilty plea hearing for their truth because "[s]olemn declarations in open court carry a strong presumption of verity." Gonzalez, 722 F.3d at 131 (quoting Blackledge, 431 U.S. at 74).  Against that backdrop, the record reveals that Derounian's guilty plea was knowing and voluntary, and the Court therefore cannot conclude that his counsel's representation plea hearing "fell below an objective standard of reasonableness."[25]  Strickland, 466 U.S. at 688.

        d)    *Ground 5*

Derounian next argues that his trial counsel and his appellate counsel were constitutionally ineffective because they did not object to the child pornography on the ground that most of the images were actually child erotica.  (Derounian Pet. at 7–8.)  Derounian's ground for relief also fails Strickland's performance component.

Derounian's claim—that a "majority" of the 514 images of child pornography was child erotica—runs into three roadblocks.  (Derounian Pet. at 28.)  First, trial counsel did object to the

---

[25]     Derounian also fails to identify what objections his trial counsel could have made at the guilty plea hearing. For this reason, too, Derounian cannot show trial counsel's representation "fell below an objective standard of reasonableness" without explaining the grounds on which he should have objected.  Strickland, 466 U.S. at 688.

child pornography in Derounian's sentencing memorandum on the ground that most of the images were child erotica.[26]   (See ECF No. 106, at 41–42 ("[T]he PSR grossly miscalculates the number of images in this case.  There are various duplicates of the same photos, over and over again, and hundreds of photos that are in no way shape inappropriate.").)  Even if the Court overlooked this fact, Derounian has proffered no evidence to support his speculation, and such "presentation of conclusory allegations unsupported by specifics is subject to summary dismissal." Blackledge, at 74.  Finally, Derounian's claim is belied by the record.  At sentencing, this Court highlighted—among other considerations—the more than "500 images of child pornography … [recovered] from Derounian's computer equipment, depicting pre and post pubescent females[,] …males, infants[,] and toddlers." (Sentencing Tr. at 43:16–20.)  Absolving all doubt about their contents, the Court explained: "I have personally reviewed all of these images.  In my view this offense is more serious than some other child pornography cases, as the images on the defendant's computer depicted toddlers and infants being sexually abused." (Id. at 43:20–24.)  Given this Court's findings at sentencing, Derounian's argument that the child pornography was in fact mostly child erotica "entitled to First Amendment protection" is wholly without merit.  (Derounian Pet. at 8.)  Accordingly, the Court "indulge[s] a strong presumption" that both trial and appellate counsel's

---

[26]    As explained above, the Court overruled trial counsel's objection.  Under such circumstances, appellate counsel could not be found ineffective under Strickland for failing to raise the issue on appeal.  Any failure to make such an argument could not have prejudiced Derounian because the argument was baseless.  See, e.g., United States v. Kirsh, 54 F.3d 1062, 1071 (2d Cir. 1995) ("[T]he failure to make a meritless argument does not rise to the level of ineffective assistance.") (citing United States v. Javino, 960 F.2d 1137, 1145 (2d Cir. 1992), cert. denied, 507 U.S. 998 (1993)); Guzman v. United States, 363 F. Supp. 3d 396, 399 (S.D.N.Y. 2019) (holding that an ineffective assistance claim based on counsel's failure to raise legal challenge clearly refuted by the record must fail).  Even if the argument wasn't baseless, Derounian's claim would still fail.  See Stinson, 214 F.3d at 322 (holding that a petitioner must show that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker") (internal citation omitted).  Indeed, appellate counsel "does not have a duty to advance every nonfrivolous argument that could be made." Id. (citing Jones v. Barnes, 463 U.S. 745, 754 (1983)).  And appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." Smith v. Robbins, 528 U.S. 259, 288 (2000).

conduct fell "within the wide range of reasonable professional assistance."[27]  Harrington, 689 F.3d at 129 (quoting Strickland, 466 U.S. at 689).  The burden of rebutting this presumption "rests squarely on the defendant," and "[i]t should go without saying that the absence of evidence cannot overcome [it]."  Burt, 571 U.S. at 22–23.  That's the case here, and the Court need not go further.

e)     *Ground 6*

In his final ground for relief, Derounian argues that his trial counsel and his appellate counsel were constitutionally ineffective when they failed to object to the special conditions imposed by the Court at the time of Derounian's sentence.  (Derounian Pet. at 9.)  This Court disagrees, finding that Derounian cannot establish that his counsels' conduct was objectively unreasonable or make the requisite showing of prejudice under Strickland.  See 466 U.S. at 688, 694.

As for Strickland's performance component, the Court again cannot conclude that trial counsel's conduct fell below an objective standard of reasonableness.  Because of Strickland's presumption that counsel's conduct satisfies the objective standard of reasonableness, "absent [a] complete lack of tactical justification, courts will generally not second-guess strategic decisions."  Gabbidon v. Lee, 2022 WL 1557272, at *18 (S.D.N.Y. Mar. 10, 2022), report and recommendation adopted, 2022 WL 1558856 (S.D.N.Y. May 16. 2022) (citing United States v. Cohen, 427 F.3d 164, 170–71 (2d Cir. 2005)).  Indeed, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made

---

[27]     As for Derounian's claim against his appellate counsel, it is clearly established that appellate counsel need not raise every "colorable" claim on appeal and may rely on his or her "professional judgment" to determine which legal arguments will most likely be successful in obtaining a reversal.  Barnes, 463 U.S. at 751–54; see also Robbins, 528 U.S. at 288 (holding that appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal").  Indeed, "[t]his process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones, 463 U.S. at 751–52).

after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690–91. Derounian pleading guilty to possession of child pornography in violation of 18 U.S.C § 2252(a)(4)(B) subjected him to: (1) the sex offender registration provisions of the Sex Offender Registration and Notification Act ("SORNA"), see 18 U.S.C. §§ 3563(a)(8), 3583(d); and (2) a term of supervised release of five years to life, see 18 U.S.C. § 3583(k).  (See PSR ¶¶ 124, 139–42.)  So "[t]he failure to object to [these special conditions] referred to in the PSR"—either before this Court or on appeal—"reflects not ineffective assistance of counsel, but more likely, counsel's familiarity with the applicable law." Masone v. United States, 103 F.2d 209, 213 (E.D.N.Y. 2000). Accordingly, the Court again "indulge[s] a strong presumption" that both trial and appellate counsel's conduct fell "within the wide range of reasonable professional assistance." Harrington, 689 F.3d at 129 (quoting Strickland, 466 U.S. at 689).

Even if the Court assumed trial and appellate counsel acted unreasonably in failing to object to Derounian's special conditions, which they did not, Derounian also cannot demonstrate prejudice.  Irrespective of his counsels' failures to object to the special conditions imposed by this Court, by receiving only ten years in prison under two of the three counts in the Superseding Indictment, Derounian "received substantial benefit from the plea agreement." See United States v. Aguiar, 2017 WL 3278887, at *5 (D. Vt. Aug. 2, 2017) (affirming that no prejudice resulted where petitioner claimed "his six-year term of supervised release was twice that allowed ... and that counsel's failure to object caused [alleged] additional prejudice" because he received a sentence "at the low end of the applicable guidelines").  "Th[is] fact alone militates against any finding of ineffective assistance and belies any claim of prejudice." See Reznikov v. David, 2009 WL 424742, at *8 (E.D.N.Y. Feb. 20, 2009) (collecting cases); see also Feliz v. United States, 2002 WL 1964347, at *7 (S.D.N.Y. Aug. 22, 2002) ("No prejudice exists when a plea agreement lessens

the severity of the sentence the defendant would face if convicted at trial.").  In any event, the special conditions this Court assigned to Derounian do not—in any way—modify the outcome of his case.  That dooms Derounian's claim, as there is no basis to conclude that he has established a "substantial" likelihood of a different result at sentencing.[28]  Garner, 908 F.3d at 871 (quoting Harrington, 562 U.S. at 112).

*     *     *

Accordingly, the Court concludes that Derounian's ineffective assistance of counsel claims provide no basis for habeas relief either.

### 4.    Ancillary Relief

Based on how the Court has resolved the merits of Derounian's § 2255 petition, the Court denies Derounian's motions for: a temporary restraining order (ECF No. 240), disqualification of counsel (ECF No. 249), appointment of counsel (ECF No. 252), and emergency preliminary injunctive relief (ECF No. 253).

As for his TRO request, Derounian moves under Federal Rule of Civil Procedure 65 to avoid having to register as a sex offender upon his release from prison.  (ECF No. 240.)  To support his request for relief, Derounian alleges that he was "falsely convicted of possessing child pornography."  (Id. at 8.)  Because Derounian's theory of innocence echoes exactly the same theory that the Court just rejected in resolving the merits of his § 2255 petition, see supra, Section II.B, the Court denies Derounian's motion for a TRO as duplicitous.  In any event, Derounian's motion does not demonstrate: "1) irreparable harm absent injunctive relief; 2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and 3) that the public's interest

---

[28]     Nor can Derounian show prejudice if his claim were somehow viewed as ineffective assistance during the guilty plea process.

weighs in favor of granting an injunction." Metro. Taxicab Bd. of Trade v. City of New York, 615 F.3d 152, 156 (2d Cir. 2010) (internal quotations and citations omitted).  Accordingly, the Court denies his motion.

As for his motion to disqualify counsel, Derounian alleges that AUSA Misorek purposefully withheld exculpatory evidence, fabricated evidence, and made material misrepresentations to the Court.  (Mot. to Disqualify Counsel at 9.)  Derounian's motion fails for two reasons.  First, Derounian's theory of harm echoes exactly the same theory that the Court just rejected—as conclusory, unsupported by the record, and without merit—in resolving the merits of his § 2255 petition, see supra, Section II.B; so Derounian's motion to disqualify counsel is duplicitous of his habeas petition.  (Compare Mot. to Disqualify Counsel at 3, with TRO at 5–6.) Second, Derounian's claim is also unsupported by the law.  Disqualification is "reserved for situations of prior representation, conflicts of interest, prosecutorial misconduct, and other unethical attorney behavior." United States v. Stewart, 294 F. Supp. 2d 490, 494 (S.D.N.Y. 2003). "Motions to disqualify are generally not favored," and, because they are "often tactically motivated" and "tend to derail the efficient progress of litigation," parties moving for disqualification "carry a heavy burden and must satisfy a high standard of proof." Felix v. Balkin, 49 F. Supp. 2d 260, 267 (S.D.N.Y. 1999) (quotation marks and citation omitted); see also Bd. of Ed. of City of New York v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979).  Derounian's "[m]ere speculation" does "not suffice" to meet this high standard, so the Court denies his motion. Streichert v. Town of Chester, 2021 WL 735475, at *5 (S.D.N.Y. Feb. 25, 2021).

Derounian's motion for appointment of counsel asks this Court to appoint the Federal Defenders of New York "to represent [him] and expedite proceedings" in connection with his petition.  (ECF No. 252, at 3.)  The Court denies his application without prejudice.  Indeed, there is no constitutional right to counsel in a proceeding brought under § 2255.  See, e.g., Pennsylvania

v. Finley, 481 U.S. 551, 555 (1987).  The Criminal Justice Act ("CJA") provides that a court may appoint counsel to an indigent person in a § 2255 proceeding when "the interests of justice so require."  18 U.S.C. § 3006A(a)(2)(B).  In deciding whether to exercise its discretion to appoint counsel in the "interests of justice" under the CJA, courts in the Second Circuit first consider "whether the indigent's position seems likely to be of substance."  Hendricks v. Coughlin, 114 F.3d 390, 392 (2d Cir. 1997) (internal quotation marks and citation omitted).  In making such a determination, the Court must decide whether "the claims asserted by the plaintiff may have merit, or the plaintiff appears to have some chance of success."[29]  United States v. Minaya, 2022 WL 594150, at *2 (S.D.N.Y. Feb. 28, 2022).  Derounian's request for appointment of counsel fails at this first step.  The Court has already concluded that his petition does not allege any viable claims and that it is otherwise without merit.  The Court thus does not find appointment of counsel appropriate, and his application is denied, without prejudice, as moot.  See United States v. Redd, 735 F.3d 88, 92 (2d Cir. 2013) (per curiam) (denying motion for appointment of counsel as moot after denying § 2255 petition); see also Salameh v. United States, 2023 WL 3960775, at *1 (S.D.N.Y. May 18, 2023) (same).

As for his request for injunctive relief, Derounian moved on July 8, 2024—again to avoid registering as a sex offender upon his release from prison—for "preliminary injunctive relief." (ECF No. 253.)  To support his request for relief, Derounian recycles the same "innocence" arguments that he put forward in his Petition Supplement (ECF No. 239) and his motion for a TRO (ECF No. 240).  (Id. at 3) ("The evidence that I have submitted demonstrates a serious Brady violation of a forensic report that was exculpatory but was deliberately hidden by Mr. Misorek so

---

[29]    "If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination."  Hodge v. Police Officers, 802 F.2d 58, 61–62 (2d Cir. 1986).

that he could concoct this absurd narrative that all of these images of child pornography were discovered by the probation officer.")  Derounian's motion fails for two reasons.  First, Derounian's theory of innocence echoes exactly the same theory that the Court just rejected—as conclusory, unsupported by the record, and without merit—in resolving the merits of his § 2255 petition, see supra, Section II.B.  Second, Derounian's claim is also unsupported by the law; he does not demonstrate: "1) irreparable harm absent injunctive relief; 2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and 3) that the public's interest weighs in favor of granting an injunction."  Metro. Taxicab Bd. of Trade, 615 F.3d at 156 (internal quotations and citations omitted).  Thus, the Court denies his motion.

*     *     *

Accordingly, the Court concludes that Derounian's follow-on motions to his habeas petition also provide no basis for relief.

### III.    CONCLUSION

For all these reasons, the Court respectfully DENIES Derounian's motion to vacate his conviction under 28 U.S.C. § 2255.  No evidentiary hearing is necessary because the files and records of the case establish that Derounian is not entitled to relief.  See 28 U.S.C. § 2255(b); see also Puglisi v. United States, 586 F.3d 209, 213–14 (2d Cir. 2009); Williams v. United States, 2022 WL 685497, at *4 (S.D.N.Y. Mar. 8, 2022) (Sullivan, J.).  Since Derounian has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue.  See 28 U.S.C. § 2253; see also Hoffler v. Bezio, 726 F.3d 144, 154 (2d Cir. 2013); Tankleff v. Senkowski, 135 F.3d 235, 241 (2d Cir. 1998).  Additionally, the Court respectfully DENIES Derounian's claims for ancillary relief.  The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore, in forma pauperis status is

denied for the purpose of an appeal.  See Coppedge v. United States, 369 U.S. 438, 444–45 (1962)

(holding that an appellant demonstrates good faith when he seeks review of a nonfrivolous issue).

The Clerk of Court is respectfully directed to terminate the motions pending at ECF Nos. 206, 240,

249, 252, 253, and to close Case No. 23-cv-00128.  The Clerk of Court is also respectfully directed

to mail a copy of this Memorandum & Order to the Pro Se Petitioner at his address of record.

**SO ORDERED.**

Dated:   August 1, 2024
         Central Islip, New York

                              _____
                                  /s/ JMA
                              JOAN M. AZRACK
                              UNITED STATES DISTRICT JUDGE